PATELCZYK v OLSON

Docket No. 78-3305. Submitted October 4, 1979, at Marquette.—Decided February 5, 1980.

Plaintiffs, Rose Patelczyk and William Patelczyk, brought an action against defendant Walter R. Olson, a board certified general surgeon, for damages for medical malpractice in the Alger Circuit Court, alleging failure to prescribe certain postoperative treatment for Mrs. Patelczyk following a mastectomy. At the close of plaintiffs' proofs, the court, William F. Hood, J., directed a verdict for defendant. Plaintiffs appeal. *Held:*

The general standard of care in a malpractice action against a general surgeon relates to what a reasonably prudent general surgeon would do or not do under the same or similar circumstances. To establish that standard and whether or not it was breached by the defendant, expert testimony from those learned in the medical profession is necessary. Use of the defendant's testimony by the plaintiffs is proper. However, the plaintiffs failed to introduce evidence of the requisite standard of care and breach thereof by defendant.

Affirmed.

1. PHYSICIANS AND SURGEONS — MALPRACTICE — STANDARD OF CARE — EVIDENCE — EXPERT TESTIMONY.

The general standard of care in a malpractice action against a general surgeon relates to what a reasonably prudent general surgeon would do or not do under the same or similar circumstances; expert testimony from those learned in the medical profession is necessary to establish that standard and whether or not it was breached by the defendant.

REFERENCES FOR POINTS IN HEADNOTES

[1] 61 am Jur 2d, Physicians, Surgeons, and Other Healers §§ 106, 202.

[1, 2] Necessity of expert evidence to support an action for malpractice against a physician or surgeon. 81 ALR2d 597.

[2] 61 Am Jur 2d, Physicians, Surgeons, and Other Healers §§ 188, 202.

[3] 31 Am Jur 2d, Expert and Opinion Evidence §§ 7, 16.

2. Physicans and Surgeons — Malpractice — Evidence — Expert Testimony.

A medical malpractice plaintiff must prove the requisite standard of care and breach thereof by expert medical testimony; this burden of proof may be satisfied by the use of the testimony of the defendant physician.

3. Evidence — Expert Testimony — Judge's Discretion — Abuse of Discretion.

Admission or exclusion of expert testimony is within a trial court's discretion and an exercise of that discretion will not be reversed unless it is clearly erroneous.

*Bridges & Collins* (by *Bruce L. Houghton*), for plaintiffs.

*McDonald & Shortley*, for defendant.

Before: Allen, P.J., and Bashara and Beasley, JJ.

Beasley, J. Plaintiffs, Rose Patelczyk and William Patelczyk, sought damages from defendant, Walter R. Olson, for medical malpractice.

Defendant, a board certified general surgeon in Munising, performed a mastectomy on Rose Patelczyk in 1975. Both she and her husband, William Patelczyk, who has filed a derivative claim, contend that defendant failed to prescribe radiation therapy and/or chemotherapy as postoperative treatment, either or both of which would have aided in preventing the spread of further cancer. Plaintiffs also claim defendant failed to refer her to specialists when she requested. At the time of trial in 1978, the cancer had metastasized to her lungs and bones, and she was hospitalized.[1]

Upon completion of plaintiffs' proofs, the trial court directed a verdict in favor of defendant. Plaintiffs appeal as a matter of right.

[1] Plaintiff, Rose Patelczyk, is now deceased.

On appeal from a directed verdict, the question is, considering the evidence in a light favorable to the plaintiff, is a prima facie case of liability established.[2]

Our review indicates that it is not; consequently, we affirm the trial court's direction of a verdict for defendant.

In this malpractice suit, the general standard of care imposed upon defendant general surgeon relates to what a reasonably prudent general surgeon would do or would not do under the same or similar circumstances. Malpractice means the failure to do something which a reasonably careful general surgeon would do or the doing of something a reasonably careful general surgeon would not do under the same or similar circumstances.

Subject to certain exceptions, which are not relevant here, expert testimony from those learned in the medical profession is required to establish the standard of professional practice in the community and to determine whether it has been breached.[3] In *Roberts v Young,*[4] the Supreme Court applied this general rule to require expert testimony on the questions of whether and what a physician should advise a patient with respect to possible postoperative results.

The issue here is slightly different. Plaintiffs' claims are not of a failure to point out possible risks and results of surgery; rather, they are that defendant failed to inform of and to prescribe forms of possible postoperative treatment for cancer and, specifically, radiation (cobalt) therapy and

---

[2] *Blanchard v Monical Machinery Co,* 84 Mich App 279, 282; 269 NW2d 564 (1978), *Zanzon v Whittaker,* 310 Mich 340; 17 NW2d 206 (1945).

[3] *Lince v Monson,* 363 Mich 135; 108 NW2d 845 (1961).

[4] 369 Mich 133; 119 NW2d 627 (1963).

chemotherapy. Thus, this is not the usual "informed consent" issue.

Plaintiffs attempted to prove their case by the testimony of defendant and three other doctors; Dr. Martinius L. Lexmond, a board qualified general surgeon and general practitioner engaged in family medicine in Ishpeming, Dr. Juan del Regato, a professor of radiology at the University of South Florida, and Dr. Wilson G. Newell, a radiologist at Bell Hospital in Ishpeming.

Reviewing their testimony, we do not find sufficient evidence that the standard of care applicable to defendant required him to prescribe radiation therapy or chemotherapy as postoperative care for plaintiff Rose Patelczyk. Whether we apply a national standard of care for board certified general surgeons, as is now required under *Francisco v Parchment*,[5] or a local community standard of care for general practitioners who perform surgery, as was previously required under *LeBlanc v Lentini*,[6] there is insufficient evidence here that defendant violated his duty to perform as a reasonably prudent board certified general surgeon would have performed under the same or similar circumstances. Specifically, we do not find evidence here that there is a standard of care applicable to defendant that would have required him, as part of postoperative mastectomy care after a 1975 mastectomy, to prescribe radiation (cobalt) treatments and/or chemotherapy.

Neither is there evidence here that what defendant did by way of postoperative care, namely, continuing observation, or what defendant did not do in regard to postoperative care constituted a violation of the standard of practice applicable to defendant.

---

[5] 407 Mich 325; 285 NW2d 39 (1979).

[6] 82 Mich App 5, 10; 266 NW2d 643 (1978).

Regarding the content of the expert testimony offered by plaintiffs, defendant doctor was called as a witness by plaintiffs.

Michigan law permits a medical malpractice plaintiff to elicit the required expert medical testimony from the defendant physician.[7] In such instances, the burden of proof remains with the plaintiff.[8] In the instant case, the issue is not whether plaintiffs rightfully employed defendant's expert testimony to make out a case sufficient for submission to the jury, but whether defendant's testimony, in fact, established a standard of practice, informing patients of available, postoperative treatment, and that what defendant did, or did not do, was contrary to that standard of practice. In evaluating defendant's testimony for purposes of measuring the correctness of the directed verdict, this Court must read it in the light most favorable to plaintiffs.[9] Dr. Olson testified with regard to his own practice in informing cancer patients of postoperative treatment alternatives:

"(By Mr. Collins, *[plaintiffs' attorney]* continuing): What is your practice, doctor, with regard to consulting with your patients after the surgery.

"A [Dr. Olson]: They are informed of the findings of the surgery.

"Q Do you discuss with them follow-up treatment?

"A Yes. They are told that—what was involved with the surgery, what was done, what was found. When the final pathology report comes back, what the findings of the pathologist were and then if there is further treat-

---

[7] *Mitz v Stern,* 27 Mich App 459; 183 NW2d 608 (1970), *Giacobazzi v Fetzer,* 6 Mich App 308; 149 NW2d 222 (1967), *McPhee v Bay City Samaritan Hospital,* 10 Mich App 567; 159 NW2d 880 (1968), *Delahunt v Fenton,* 244 Mich 226, 230; 221 NW 168 (1928).

[8] *Mitz v Stern, supra,* 464-465.

[9] See *Marchlewicz v Stanton,* 50 Mich App 344, 347-348; 213 NW2d 317 (1973).

ment indicated, and sometimes there's more than one route to go, the options are discussed with the patient.

"Q What are the options for a post-cancer or a post-mastectomy?

"A The options, of course, for the treatment to begin with is—surgery is the basis of the treatment. Then following that, there is a wide difference of opinion as to what should be done next, whether no treatment is done, whether radiation therapy is given, whether chemotherapy is given, or a combination of the two are given, and—

"Q Doctor, in your practice, do you tell the patient, give the patient—is it your practice to tell them what these alternatives are?

"A Yes.

"Q You tell them how available these alternatives might be?

"A Yes.

"Q Now, you tell them that there is radiation treatment available?

"A Yes."

He did not intimate that this was the customary practice of skilled medical practitioners either in his community or similar communities. When asked whether it was the practice to follow-up with radiation therapy or chemotherapy in this area, he answered, "it depends on who you talk to". Obviously, Dr. Olson believes the better and significant medical opinion did not advocate the general use of radiation therapy or chemotherapy after a mastectomy. However, even assuming that his testimony established the standard of practice followed by a general surgeon in informing his patient of postoperative alternatives, there is no indication in defendant's testimony that he violated the standard of care.

Compare this situation to that in *McPhee v Bay*

*City Samaritan Hospital,*[10] where the defendant physician stated at trial that he had performed over 100 thyroidectomies, and that in performing such an operation, the laryngeal nerve should be avoided, and to *Mitz v Stern,*[11] where the defendant physician testified that it is not customary practice to come into contact with the sphincter muscles when performing a transurethral resection.

We find that although Dr. Olson stated he is a board certified general surgeon, his testimony did not include factual information by way of foundation to show that he, in fact, knew what the applicable general standard of care was. Although Dr. Olson stated what was customarily done in his own practice, he did not assert it to be the applicable standard, nor did he state what would constitute an impermissible deviation from any applicable standard. Consequently, we do not find the testimony of Dr. Olson establishing a prima facie case for submission to a jury.

Second, we consider plaintiffs' claim that the testimony of Dr. Lexmond established the standard of care applicable to defendant in providing postoperative treatment after a mastectomy.

Prior to trial, the trial court granted a motion to strike the testimony of Dr. Lexmond as contained in his videotape deposition. The trial court possesses discretion to admit or exclude expert testimony, and, on appeal, the trial court's decision will not be disturbed by this Court unless it is clearly erroneous.[12]

Dr. Lexmond expressed a preference for use of

---

[10] *McPhee v Bay City Samaritan Hospital, supra.*

[11] *Mitz v Stern, supra.*

[12] *Johnson v Detroit,* 79 Mich App 295; 261 NW2d 295 (1977), *Coger v Mackinaw Products Co,* 48 Mich App 113; 210 NW2d 124 (1973).

radiation treatment in his own practice, but he said that, except where a patient is not "rational", the decision whether to use radiation therapy or chemotherapy is for the patient. However, he declined to say that the use of radiation therapy and/or chemotherapy are the *only* acceptable treatments. Also, he said he did not think it was malpractice *not* to recommend radiation treatment or chemotherapy.

We do not find that the trial court's refusal to admit Dr. Lexmond's testimony was clearly erroneous. His videotape deposition did not establish a jury-submissible case of malpractice.

Third, we consider the videotape deposition of Dr. del Regato, which was admitted into evidence. At the time of the deposition in 1978, Dr. del Regato was a professor of radiology at the University of South Florida and was a specialist in therapeutic radiology. The record does not indicate whether or not he is board certified.

The following colloquy took place between plaintiffs' and defendant's counsel at the deposition:

"Q [*Mr. Collins, plaintiffs' counsel*]: Doctor, I have given you copies of hospital records and doctors reports of Rose Patelczyk.

"A [*Dr. del Regato*]: Yes.

"Q Have you had a chance to evaluate these things?

"A I have spent several hours going over the records of the various admissions and the correspondence involved in the case of Mrs. Patelczyk and I have made a summary of the positive findings that you have in front of you.

"Q Doctor, had you been consulted by Mrs. Patelczyk, what kind of treatment would you have recommended?

"MR. MCDONALD: I think, Mr. Collins, I am now going to enter an objection to the further testimony of Dr. del Regato unless he is qualified in a manner which meets the requirements of this case. In other words, is

he being asked to render an opinion as to the standard of care for a general practitioner or a surgeon in Munising, Michigan or a similar community at the time of the treatment by Dr. Olson. Is that what he is asked to do?

"MR. COLLINS: I have asked Dr. del Regato what he would have done under these circumstances. I have not asked him if, in the sense that he was a doctor in Munising, Michigan, as a general practitioner.

"MR. MCDONALD: I will enter an objection on the record here on the basis of irrelevancy—as I am sure you are aware, you can answer. Do you intend, may I ask at this time, do you intend to qualify Dr. del Regato to render an opinion on the standard of care?

"MR. COLLINS: No, I am not going to ask Dr. del Regato to render an opinion on what the standard of care is in Munising, Michigan. Dr. del Regato is one of the foremost authorities in cancer in the country and I am consulting with and we are taking his testimony to determine cancer treatment and what cancer is about. We will find some other witnesses as to what the standard of care should be in the Upper Peninsula."

Unfortunately, both counsel were proceeding under the assumption that the applicable standard of care was that of a reasonably prudent general practitioner in Munising, Michigan, at that time. Consequently, while Dr. del Regato expressed his preference for radiation therapy for plaintiff, Rose Patelczyk, he does *not* say that a postoperative course of observing and watching for possible recurrence of cancer cells is an improper procedure or a breach of the accepted standard of care.

We find that Dr. del Regato's testimony establishes neither a standard of care applicable to defendant nor any violation by defendant of his professional duty. The trial court was not clearly erroneous in its evaluation of Dr. del Regato's testimony.

Fourth, we consider the testimony of Dr. Newell,

who is a specialist in radiology in Ishpeming. He accepts patients on a referral basis and performs no surgery. This experience has familiarized him with what general surgeon—general practitioners do, so that it can be said he knows the standard of care in Ishpeming, a generally similar community to Munising.

Taking his testimony in a light most favorable to plaintiffs, Dr. Newell at no time stated that it was standard procedure for physicians and surgeons, in the exercise of ordinary care, to provide postoperative radiation treatment or chemotherapy, or that Dr. Olson's failure to do so was malpractice.

The trial court was not clearly erroneous in determining that Dr. Newell's testimony was insufficient as a basis for submission of plaintiffs' case to the jury.

Thus, taking the experts' testimony offered by plaintiffs in a light most favorable to plaintiffs, either separately or altogether in concert, plaintiffs fail to establish a prima facie case of liability.

We recognize that there is a conflict in the testimony of plaintiffs and of defendant as to their conversations respecting postoperative treatment. Since plaintiffs have established neither the standard of care required of defendant nor a breach of the applicable standard of care by competent medical testimony, the credibility issue between the parties is not relevant on appeal. Even if we assume plaintiffs' testimony to be true, a jury-submissible issue of malpractice is not established here.

We also recognize that this case was tried on the assumption that the acceptable standard of care required of defendant was a local or community standard, rather than a national standard. We

note that this assumption appeared to find support in *LeBlanc v Lentini, supra,* but, under *Francisco v Parchment, supra,* no longer prevails.

Our conclusion that plaintiffs have failed to establish a prima facie case for jury submission applies under either the national standard of *Francisco v Parchment,* or the local community standard of *LeBlanc v Lentini.*

Affirmed, with costs.